FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

03 MAR 19 PM 12: 47

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| OCTAVIA V. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 00-JEO-2663-W |
| | ) | |
| NEW SOUTH FEDERAL SAVINGS | ) | |
| BANK, | ) | |
| | ) | |
| Defendant. | ) | |

ENTERED

MAR 19 2003

## MEMORANDUM OPINION

### I.   INTRODUCTION

Before the court is the defendant's Motion for Summary Judgment. (Doc. 18).[1] Octavia
V. Johnson (hereinafter "Johnson" or the "plaintiff") filed this action against New South Federal
Savings Bank (hereinafter "New South" or the "defendant"), her former employer. The plaintiff
alleges that her employment was terminated illegally in violation of the federal Age
Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* (hereinafter "ADEA" or "federal
ADEA"), and the state Age Discrimination Act (hereinafter "state ADEA"), Ala. Code §
25-1-29. She also asserts state tort claims.

The defendant seeks summary judgment on the grounds that there are no genuine issues
of material fact and that it is entitled to judgment as a matter of law on all the plaintiff's claims.
(Doc. 18). The plaintiff opposes the motion. (Doc. 23).

---

[1]References to "Doc. __" are to the documents as numbered by the clerk of court in the
court's record of the case.

For the reasons set forth below, the court finds that the defendant's motion for summary judgment is due to be granted.

## II.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III.   FACTUAL BACKGROUND[2]

The plaintiff began working as a loan processor in New South's Tuscaloosa, Alabama, mortgage lending office (hereinafter the "Tuscaloosa branch" or Tuscaloosa office") on November 16, 1998. (Pl. Depo. at 51-52, 59). At the time she was hired, the plaintiff was 40 years and eight months old. (Pl. Depo. at 7, 59). Branch Manager Karl Keller (hereinafter "Mr. Keller") was her supervisor during her employment with New South. (Doc. 23 at 10).

The plaintiff was working as a loan processor of commercial loans at National Bank of the South when she was approached by Becky Hess, a loan officer at New South, about possibly coming to work for New South. (Pl. Depo. at 33-36). After interviewing the plaintiff, Mr. Keller hired her. (K. Keller Aff. at ¶ 6; K. Keller Depo. at 35-37). The plaintiff alleges that before she accepted the position, certain promises were made to her about the training she would receive, the duties she would perform and the hours she would be required to work. (Doc. 23 at 2-3).

The plaintiff was not offered a formal training program, but did informal training on the job. She spent the first three days watching Elizabeth Keller (hereinafter "Mrs. Keller")[3] process loans and helping her. (Pl. Depo. at 61-62). Mrs. Keller also gave the plaintiff manuals and checklists describing how to process loans at New South. (Pl. Depo. at 122, 260-63; E. Keller Depo. at 31-32). The plaintiff attended a training session with Tracy Keane in Birmingham, and Keane later came to Tuscaloosa to do a one-on-one organizational training session with the

---

[2]The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "facts for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[3]Karl Keller and Elizabeth Keller were married during the relevant period in this case.

3

plaintiff. (Pl. Depo. at 180-82, 192-95). The plaintiff also attended a three-day seminar in Birmingham in February 1999, that dealt with the new computer loan processing program. (Doc. 23 at 4).

      Mr. Keller stated as follows:

> Soon after I hired Ms. Johnson, it became apparent that she was not performing adequately. I attempted to provide her training to help her learn and perform. In addition to other training provided to Ms. Johnson, I specifically requested that Ms. Johnson receive one-on-one training from Tracy Keane. I never requested that any other processor receive such one-on-one training. In fact, the training I made available to Ms. Johnson was more than that which I provided to any other loan processor who worked in New South's Tuscaloosa office while I was the Branch Manager.

(K. Keller Aff. at ¶ 7).

      About two weeks before the plaintiff was terminated, Mr. Keller had a conference with her and complained that she was not working fast enough and that her approval ratios (indicating how many loans were approved as opposed to how many were not) were down. (Pl. Depo. at 146-48). The plaintiff asserts that when she asked Mr. Keller whether he wanted accuracy or speed, he said speed. (Pl. Depo. at 147-48). In March of 1999, Mr. Keller recommended to his supervisor that the plaintiff be discharged because she was unable to get loans processed and ready for closing in a timely manner. (K. Keller Aff. at ¶ 9). At or about that time, Mr. Keller restructured the plaintiff's position, taking away processing responsibilities and assigning her to assist Mrs. Keller with the file set-ups, in order to speed up the loan processing so as to meet closing deadlines. (K. Keller Depo. at 108-12). Mr. Keller stated that the plaintiff's performance remained deficient after her position was restructured. (K. Keller Depo. at 109, 136-37).

At the time of the plaintiff's termination on March 24, 1999, for the stated reason that she failed to perform her duties (K. Keller Depo. at 122, 137-38, 197-99; Pl. Ex. 19; Pearce Depo. at 102-07), the plaintiff was 41 years old.  (Pl. Depo. at 7).

## IV.   DISCUSSION

### A.   Federal ADEA Claim - Timeliness of EEOC Charge Filing

The plaintiff asserts a claim under the federal ADEA, which provides that a plaintiff cannot commence a civil action under the statute unless he or she has filed a charge of discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC") "within 180 days after the alleged unlawful practice occurred."  29 U.S.C. § 626(d)(1).  New South terminated the plaintiff's employment on March 24, 1999, and the plaintiff did not file an EEOC charge until September 23, 1999, 183 days later.  (Complaint at ¶ 10, Ex. A; Pl. Depo. at D, Ex. 3).  New South thus asserts that the plaintiff has failed to satisfy an administrative prerequisite to suit, and that her ADEA claim is thus due to be dismissed.  (Doc. 19 at 10).

The plaintiff argues, however, that she did not discover that she had been replaced by two younger female employees until about one and a half months to two months after her termination. (Pl. Depo. at 161-62).  She argues that her subsequent replacement by the younger employees should be regarded as part of a "continuing violation" so that the 180 days is measured by the date she was replaced (April and May of 1999).  (Doc. 23 at 12-15).

In arguing that she was not aware of the younger replacements until after she was terminated, the plaintiff is actually asserting, in substance, an equitable tolling argument, rather than a "continuing violation" argument.  Equitable tolling in this context has been explained as follows:

5

"The requirement that a claimant file 'a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to sue in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.'" *Stafford v. Muscogee County Bd. of Educ.*, 688 F.2d 1383, 1387 (11th Cir. 1982) (quoting *Zipes v. Transworld Airlines, Inc.*, 455 U.S. 385, 393, 102 S. Ct. 1127, 1132, 71 L. Ed. 2d 234 (1982)). *See also Coke v. General Adjustment Bureau, Inc.*, 640 F.2d 584, 589-95 (5th Cir. 1981) (en banc) (the 180-day notice requirement is not a question of subject matter jurisdiction, but is more in the nature of a statute of limitations which is subject to equitable tolling). The legislative history of the ADEA also supports the conclusion that equitable tolling applies to the 180-day filing requirement. The conferees stated:

> The conferees agree that the 'charge' requirement is not a jurisdictional prerequisite to maintaining an action under the ADEA and that therefore equitable modification for failing to file within the time period will be available to plaintiffs under this Act.

*Coke*, 640 F.2d at 594 (citations omitted). Therefore, it is settled law that the charging period of the ADEA is subject to equitable modification. *Cocke v. Merrill Lynch & Co., Inc.*, 817 F.2d 1559, 1561 (11th Cir. 1987).

Under equitable modification, a limitations period does not start to run until the facts which would support a charge of discrimination are apparent or should be apparent to a person with a reasonably prudent regard for his rights. *Reeb v. Economic Opportunity Atlanta, Inc.*, 516 F.2d 924, 931 (5th Cir. 1975). [Footnote omitted]. *See also Hill v. Metropolitan Atlanta Rapid Transit Auth.*, 841 F.2d 1533, 1545 (11th Cir. 1988) (the 180 days begins running from the date the employee knows or reasonably should know that he or she has been discriminated against). It is not necessary for a plaintiff to know all the facts that support his claim in order to file a claim. *Blumberg v. HCA Management Co.*, 848 F.2d 642, 645 (5th Cir. 1988), *cert. denied*, 488 U.S. 1007, 109 S. Ct. 789, 102 L. Ed. 2d 781 (1989). "[A] plaintiff who is aware that he [he] is being replaced in a position [he] believes [he] is able to handle by a person outside the protected age group knows enough to support filing a claim." *Id.*

*Sturniolo v. Sheaffer, Eaton, Inc.*, 15 F.3d 1023, 1025 (11th Cir. 1994). The Eleventh Circuit

recently mentioned *Sturniolo*, stating as follows:

> In *Sturniolo*, the plaintiff of an age discrimination case had no knowledge he was replaced in his job by a younger person until several months after his discharge. *Sturniolo v. Sheaffer, Eaton, Inc.*, 15 F.3d 1023, 1025 (11th Cir. 1994). Due to this delay, more than 180 days elapsed from the day Sturniolo received notice of

6

his termination until the filing of his EEOC complaint. *Id*. at 1024. Because
Sturniolo had insufficient information to file his complaint, we said the filing
requirement should be equitably tolled "until the facts which would support a
charge of discrimination are apparent or should be apparent to a person with a
reasonably prudent regard for his rights." *Id*. at 1025.

*Wright v. AmSouth Bancorporation*, 2003 WL 245588, *4 (11th Cir. Feb. 5, 2003).

Given that the plaintiff has presented evidence that she did not know that she had been

replaced with younger employees until April and May of 1999, and given that this was the

information that put her on notice that her rights under the federal and state age discrimination

laws had potentially been violated so as to support an EEOC charge, the court finds that, under

equitable tolling rules, the 180-day period did not begin to run until the plaintiff discovered this

information. This was the time at which the plaintiff knew or reasonably should have known that

she had arguably been discriminated against, so her EEOC charge was timely filed. The court

therefore finds that New South's motion for summary judgment is due to be denied on this basis.

**B.     ADEA Claims - Pretext Arguments**

The plaintiff offers circumstantial evidence in support of her ADEA claims, which means

that they are subject to the burden-shifting analysis formulated in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25, 36 L. Ed. 2d 668 (1973). The

circumstantial evidence standards in discriminatory treatment cases like these are well

established:

> *McDonnell Douglas* and subsequent decisions have established an
> allocation of the burden of production and an order for the presentation of proof in
> . . . discriminatory-treatment cases. First, the plaintiff must establish a prima facie
> case of discrimination. . . . The burden [then] shift[s] to [the defendant] to
> produce evidence that the plaintiff was rejected, or someone else was preferred,
> for a legitimate, nondiscriminatory reason. This burden is one of production, not
> persuasion; it can involve no credibility assessment. [When the defendant offers]

7

admissible evidence sufficient for the trier of fact to conclude that [the plaintiff] was fired [for a legitimate, nondiscriminatory reason], the *McDonnell Douglas* framework--with its presumptions and burdens--disappear[s], and the sole remaining issue [is] discrimination vel non . . . .

Although intermediate evidentiary burdens shift back and forth under [the *McDonnell Douglas*] framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.[4]  And in attempting to satisfy this burden, the plaintiff--once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision--must be afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Ibid.*; *see also St. Mary's Honor Center*, [509 U.S. 502,] 507-508 (1993).  That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence." *Burdine, supra*, at 256.  Moreover, although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case "and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Burdine, supra*, at 255, n.10, 67 L. Ed. 2d 207, 101 S. Ct. 1089.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105, 116-17 (2000) (internal citations and quotations omitted).

In determining whether summary judgment or judgment as a matter of law is appropriate in any particular case, the court should take into consideration a number of factors. Those factors "include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered. . . ." *Reeves*, 120 S. Ct. at 2109.  "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.*

---

[4]*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981).

New South argues that it is due summary judgment with respect to the plaintiff's federal and state ADEA claims[5] because the plaintiff cannot show that the legitimate, nondiscriminatory reasons offered by New South for her termination are a pretext for illegal age discrimination. New South assumes, for the purposes of the instant motion, that the plaintiff can establish a *prima facie* case of age discrimination. (Doc. 19 at 11). The court will make the same assumption for the purposes of this analysis.

### 1.    New South's proffered legitimate, nondiscriminatory reason for the plaintiff's termination

New South asserts that the plaintiff was terminated for a legitimate, nondiscriminatory reason – because Mr. Keller was dissatisfied with her job performance as a loan processor. Mr. Keller stated that he began to notice the plaintiff's performance problems almost immediately. (K. Keller Depo. at 82-83). According to Mr. Keller, the plaintiff was unable to get loan files prepared for closing in a timely manner. (K. Keller Depo. at 82-83, 86, 89-90, 106, 113, 130-31). He also stated that an inordinate number of files submitted by the plaintiff to underwriting were returned as "suspended," meaning that the closing process was delayed while the plaintiff gathered additional information and re-submitted the loan to the underwriter. (K. Keller Depo. at 89-90, 106). At loan closing, the plaintiff's files would still be incomplete, and eleventh-hour additions or accommodations would have to be made, which often angered the buyer, realtor or closing attorneys involved. (K. Keller Depo. at 86, 110-12).

---

[5]The state ADEA states that "[a]ny employment practice authorized by the federal Age Discrimination in Employment Act shall also be authorized by" the state ADEA.  Ala. Code § 25-1-29.  And all defenses available under the federal ADEA are available under the state ADEA, except that plaintiffs are not required to pursue any administrative remedy before filing suit under the state ADEA. *Id.*

Mrs. Keller also found the plaintiff's performance to be deficient. Mrs. Keller was, during the relevant time period, the office manager and a loan processor in New South's Tuscaloosa branch. She had numerous conversations with the plaintiff about problems with individual loan files. (E. Keller Depo. at 32-35). She stated that the problems were of such quantity and nature that she concluded that the plaintiff lacked basic, fundamental processing knowledge. (E. Keller Depo. at 46; E. Keller Aff. at ¶ 4).

New South argues that Mr. and Mrs. Keller's subjective observations about the plaintiff's performance were supported by objective evidence as well. New South asserts as follows:

> A normal workload for a processor is to have 40 to 45 loans in process each month, of which 30 to 35% close. (Pearce Depo., p. 89). Accordingly, a Processor carrying a "normal workload" should submit about 15 loans to underwriting each month. By her own estimate, Plaintiff was processing only 20 to 30 loans each month. (Plaintiff's Depo., pp. 263-64). During the five calendar months of her employment, Plaintiff submitted a total of 25 loans to underwriting: none in November, five in December, six in January, seven in February and seven in March. (Pearce Aff., ¶ 9, Ex. A).
>
> The other Processors in Tuscaloosa processed many more loans than Plaintiff. During the same five calendar months in which Plaintiff processed 25 loans, Mrs. Keller, the only other Processor in the Tuscaloosa office, submitted 121 loans to underwriting, including 57 government loans. (Pearce Aff., ¶ 10; Ex. A). Further, Mrs. Keller processed these loans in addition to performing her Office Manager duties. (E. Keller Depo., pp. 17-19). The Processors New South hired in Tuscaloosa after Plaintiff's termination, Tammy Knierim and Lisa Fair, in their first five calendar months of processing, processed 87 and 67 loans respectively, including 51 and 37 government loans. (Pearce Aff., ¶¶ 11-12; Ex. A). Based on the strictly objective evidence, Plaintiff simply did not process as many loans as the other Processors who worked in the Tuscaloosa branch. This is particularly important in light of the emphasis Mr. Keller placed on speed in processing loans. (K. Keller Depo., pp. 79-80).

(Doc. 19 at 12-13).

10

### 2.    The plaintiff's pretext arguments

In response to New South's contention that her mistakes were of such quantity and nature that the Kellers concluded that she should be terminated, the plaintiff holds up Onalisa Arrington as a comparator. She argues that Arrington was hired with no experience because the Kellers felt that they could train her to be a loan processor. (Doc. 23 at 16-17, citing Doc. 19 at 3, K. Keller Aff. at ¶ 5). The plaintiff argues as follows:

> Ms. Arrington, who is 22 years old, failed miserably, but was reassigned from loan processor duties to assistant and her job was restructured twice because of her lack of knowledge. Even though Arrington was not doing any loan processing, the defendant relies on her statistical figures in comparing the plaintiff's job performance. (K. Keller depo., p. 154-155; Pearce's Aff. Ex. 1, Bates Nos. 460-464).

(Doc. 23 at 17). The court notes, however, that in the argument in the defendant's brief (doc. 19 at 12-13), the defendant did not refer to Ms. Arrington's statistical figures.

The plaintiff also argues that the objective measures of her performance used by New South in its arguments do not accurately reflect her performance. She states as follows:

> Plaintiff was hired on November 16, 1998, and spent the first three days training and assisting Ms. Keller, however, defendant states that the month of November is indicative of Plaintiff's job performance in that she did not process any loans. Also, Plaintiff was removed from loan processing responsibilities on March 3, 1999, however Defendant included the March figures in her processing statistics. (Defendant's Brief, p. 13; Pearce Aff. ¶ 9).

(Doc. 23 at 17). In fact, the plaintiff argues that the objective evidence shows that her performance was better than Mrs. Keller's. She states as follows:

> Plaintiff's statistical figures were indeed better than Mrs. Keller's. For instance, in December of 1998, the branch first time approval rate average was 63.9, Plaintiff's average was 60 percent. (Pl.'s Ex. 3) (Pearce depo., p. 120). The next month, Plaintiff's approval rating went to 66.7 percent and the branch average sunk to 56.3 percent. Elizabeth Keller, a seasoned mortgage company processor,

11

> was processing at only 50 percent. (Pearce depo., p. 121). In February, the
> branch average was 52.6 and Plaintiff was processing at 57.1; Elizabeth Keller
> was 45.5. Tammy Knierim, Plaintiff's young replacement had a 33.3 percent
> approval rate the first month, 50 percent the second month, 33 percent the next
> month and 61.9 percent the fourth month. However, Pearce did not know if
> Knierim was counseled for her poor performance, or if Plaintiff was doing a better
> job than Knierim. (Pearce depo., pp. 124-125).

(Doc. 23 at 18).

The plaintiff also complains that Mr. Keller did not follow New South's policy of

progressive discipline before terminating her. The plaintiff states as follows:

> It is undisputed that Keller never relayed to Plaintiff he was going to terminate her
> if her performance did not improve, nor did he tell her that if her approval ratio
> was not better, she was going to be terminated. (K. Keller depo., pp. 138, 139).
> Defendant admits that Keller did not issue any of the memos where he complained
> about Plaintiff's performance. (Defendant's Brief, p. 15, fn.7).
>
> * * *
>
> Plaintiff was the first employee that Keller had terminated at New South. (K.
> Keller depo., p. 143). Keller states that he never had Plaintiff sign a written
> reprimand because he felt that would cause her stress by having her sign such a
> document and alienate Plaintiff. (K. Keller depo., p. 144). Keller states that he
> assumed Plaintiff knew her job was in jeopardy when, for all practical purposes,
> he removed responsibilities from her and she still did not perform. (K. Keller
> depo., p. 145). However, Keller never told Plaintiff that the job restructuring was
> a disciplinary move or if she did not improve, she would be terminated. Even
> though Keller states he demoted Plaintiff by removing some of her
> responsibilities, he doesn't know that by removing responsibilities from the
> younger Onalisa Arrington was also a demotion. Keller told Plaintiff that he was
> restructuring her position to help her in the learning process. (K. Keller depo., p.
> 149). Two weeks later, Plaintiff was terminated.

(Doc. 23 at 17-18).

The plaintiff argues that the legitimate, nondiscriminatory reason offered by New South,

her poor job performance, is pretext for illegal age discrimination. She argues that "[a] jury

could certainly find pretext in Defendant never articulating to the plaintiff why she is being

12

discharged, never disciplining the plaintiff for poor job performance and the fact she was doing a better job than her trainer (Mrs. Keller) or her subsequent replacements (Fair and Knierim)." (Doc. 23 at 20).

With respect to the first of these arguments – that New South never articulated to the plaintiff why she was being discharged – New South argues that the plaintiff conceded that Mr. Keller made it clear throughout her employment that he was dissatisfied with her performance, so that when Mr. Keller's explanation that she was terminated because "things were not clicking," should have been sufficient.[6]  (Doc. 26 at 6, citing Pl. Depo. at 159-61). The plaintiff, however, testified as to only one incident in which Mr. Keller told her that he was dissatisfied with her performance, which she alleges occurred two weeks before her termination. (Pl. Depo. at 146-48, 160-61). The plaintiff also stated that one of Mrs. Keller's comments about the amount of her husband's paycheck was clearly meant as implied criticism of the plaintiff's timeliness in processing loans. (Pl. Depo. at 149-50). The plaintiff did admit that she was making mistakes in her work, and that she was not working to her full capacity as a loan processor. (Pl. Depo. at 159-60).

Although it is clear that New South could have done a much better job of communicating with the plaintiff about her performance problems, the evidence shows that she did receive some notice that her performance was deficient and that she was aware of the deficiency. The court is not convinced that Mr. Keller's deficiencies in communicating his dissatisfaction to the plaintiff

---

[6]According to the complaint, "[o]n March 25, 1999, Plaintiff was called into Mr. Keller's office and told that things were 'not clicking' and that his boss, Mike Pearce, thought they should go their separate ways." (Doc. 1 at ¶ 26).

shows "that the employer's proffered explanation is unworthy of credence." *Burdine*, *supra*, at 256.

With respect to the second of these arguments – that New South failed to discipline the plaintiff for her poor performance – New South states that this argument is based upon the plaintiff's erroneous assertion that New South had a policy of progressive discipline. The only support plaintiff offers for this assertion, New South argues, is the deposition testimony of Mr. Pearce that he personally "tries to" use progressive discipline. (Doc. 26 at 6 n.6, citing Doc. 23 at 10).

It appears that New South is taking an unduly narrow view of the plaintiff's argument, however. The plaintiff's argument seems to be, rather, that Pearce had a role in the decision-making process, that he typically tries to use progressive discipline, that he used such discipline with a younger employee, Jerry McCoy, in the Tuscaloosa branch before terminating him, but that he failed to use such discipline with respect to the plaintiff before terminating her. (Doc. 23 at 10, citing Pearce Depo.). Pearce explained that he used progressive discipline with McCoy because McCoy had alleged that Mr. Keller had illegally discriminated against him.[7] (Pearce Depo. at 108-10). New South argues that Mr. Keller chose to deal with the plaintiff's performance problems informally "because he believed he could better improve her morale and salvage her employment by not confronting her with formal discipline or written warnings."

_____

[7]New South also points out that the plaintiff's situation is different from that of McCoy because he held a different position, that of originator, and that he was compensated differently than were the loan processors. (Doc. 19 at 17). Loan processors are paid set salaries, whereas originators are paid on commission after an initial 90-day draw, so an originator's lack of productivity does not financially impact New South in the same way as would a loan processor's lack of productivity.

14

(Doc. 26 at 7, citing K. Keller Depo. at 129).  New South points out that Keller violated no employer policy by doing so.

Although it appears that there was some inconsistency in the disciplinary procedures used in connection with the terminations of plaintiff and McCoy, it also appears that there were differences in the two employee's situations and in the circumstances of their last period of employment by New South.  Looking at the evidence and arguments offered by the parties, the court is not convinced that New South's inconsistency in this regard or its failure to use progressive discipline with the plaintiff shows "that the employer's proffered explanation is unworthy of credence."  *Burdine*, *supra*, at 256.

With respect to the third of these arguments – that the plaintiff was doing a better job than her trainer (Mrs. Keller) or her subsequent replacements (Fair and Knierim) – New South asserts that the plaintiff erroneously focuses on only one set of statistics in making this argument, namely the first time approval rates, which ignores other vital aspects of a loan processor's job. (Doc. 26 at 7).  New South states as follows:

> Although Plaintiff's first time approval rates may have been higher than other
> Loan Processors in Tuscaloosa, she was processing about a third as many loans as
> the other Loan Processors. (New South's Brief, pp. 12-13; M. Pearce Aff., at ¶¶
> 8-12, Ex. A). Mr. Keller was clear that speed was an important part of Plaintiff's
> job and that she was not processing loans fast enough. (Pl. Brief, p. 5; Pl. Depo.,
> pp. 160-61). In fact, Mr. Keller based his decision to terminate Plaintiff not on
> her failure to satisfy any statistical goal, but on her general lack of productivity.
> (K. Keller Aff., ¶ 9; New South's Brief, pp. 6-8, 12).

(Doc. 26 at 7).

According to New South, the plaintiff is merely quibbling with Mr. Keller's evaluation criteria, so she cannot succeed in showing pretext. (Doc. 26 at 7, quoting *Chapman v. A.I.*

*Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) ("Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed merely by quibbling with the wisdom of that reason."). New South further argues that since productivity is a reasonable evaluation criteria, the plaintiff's quibbling cannot rebut the proffered legitimate, nondiscriminatory reason and thus demonstrate pretext. (Doc. 26 at 8).

The court is inclined to agree with New South with respect to this pretext argument. It appears that the plaintiff has plucked one type of statistic, that most favorable to her position, out of several relevant performance indicators, and has essentially ignored the rest. It defies common sense to disregard other important indicia of the plaintiff's performance. The plaintiff's pretext arguments in this regard do not show "that the employer's proffered explanation is unworthy of credence." *Burdine, supra*, at 256.

In accordance with the analysis set forth above, the plaintiff has not shown that New South's proffered legitimate, nondiscriminatory reason for her termination is pretextual. New South is therefore due summary judgment with respect to the plaintiff's federal and state ADEA claims.

## C.    STATE LAW CLAIMS[8]

### 1.    Negligent training and supervision

The plaintiff alleges that New South negligently failed to train, supervise and discipline Mr. Keller and failed to protect her from injury, although it knew of Mr. Keller's incompetence

---

[8]The plaintiff has voluntarily dismissed her state law claim of slander per quod. (Doc. 19 at 2).

16

and negligence. (Doc. 1 at ¶ 48). She alleges that New South "failed to consider the proper

requirements for the training of Mr. Keller as manager/supervisor and further failed to train [him]

on managerial standards of conduct and the policies and procedures of New South." (Doc. 1 at ¶

49). Furthermore, the plaintiff alleges that

> Defendant had notice of the supervisor's propensities for violating company
> policies and for acting in the manner complained. Defendant failed to carry out
> the policies of the corporation, specifically those policies affecting the civil rights
> of the plaintiff and further that the defendant, having such knowledge, negligently
> failed to carry out the laws of the United States of America and the State of
> Alabama. Defendant, having such knowledge of the supervisor's actions and the
> propensity to violate the company policies and the laws of the United States and
> the State of Alabama negligently failed to discipline or terminate the
> supervisors/managers[9] and failed to protect plaintiff from further injury.

(Doc. 1 at ¶ 50). As a result, the plaintiff argues, she suffered damages in connection with illegal

age discrimination.[10] (Doc. 1 at ¶ 51).

In support of her negligent training and supervision claim, the plaintiff cites *Big B, Inc. v.*

*Cottingham*, 634 So. 2d 999 (Ala. 1993), *abrogated on other grounds*, *Horton Homes v. Brooks*,

832 So. 2d 44 (2001), in which the court stated as follows:

> In *Lane v. Central Bank of Alabama, N.A.*, 425 So. 2d 1098, 1100 (Ala. 1983),
> this Court, quoting *Thompson v. Havard*, 285 Ala. 718, 723, 235 So. 2d 853
> (1970), stated:
>
> > "In the master and servant relationship, the master is held
> > responsible for his servant's incompetency when notice or
> > knowledge, either actual or presumed, of such unfitness has been

---

[9]The plaintiff apparently refers to both Mr. and Mrs. Keller here, but her arguments with respect to this claim are focused on Mr. Keller.

[10]This claim should fail because the plaintiff has failed to show a genuine issue of material fact with respect to her claim that Mr. Keller illegally discriminated against her. In an abundance of caution, however, the court will address the merits of this claim as if the plaintiff had asserted a viable claim of discrimination.

17

brought to him. Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge. It is incumbent on the party charging negligence to show it by proper evidence. This may be done by showing specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice. While such specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant to leave it to the jury whether they would have come to his knowledge, had he exercised ordinary care."

*See, also, Ledbetter v. United American Ins. Co.*, 624 So. 2d 1371 (Ala. 1993).

*Big B*, 634 So. 2d at 1002-03.

New South argues that the plaintiff has not offered adequate evidence showing that it had notice of Mr. Keller's alleged incompetence – in this case, his alleged practice of treating employees differently on the basis of age. In fact, New South argues, the plaintiff admits that she never filed a complaint about Mr. Keller with New South and she also testified that "I honestly do not believe that [New South corporate employees] in Birmingham knew what was going on in the Tuscaloosa office." (Doc. 19 at 22, citing Pl. Depo. at 227). As New South argues, even the plaintiff admitted that, during her employment with New South, she did not notice any propensity on Mr. Keller's part towards age discrimination. (Doc. 26 at 8, citing Pl. Depo. at 207-08). It was only after he hired two younger employees following her termination that she suspected that she had been the victim of age discrimination. (Pl. Depo. at 207-08).

18

The plaintiff offers several items of evidence in support of her argument that New South had notice of Mr. Keller's alleged incompetence. First, she argues, before her termination, Jerry McCoy had complained to New South management that Mr. Keller was illegally discriminating against him on the basis of his race. (Doc. 23 at 21). New South asserts that this argument must fail because a claim of race discrimination against Mr. Keller would not serve as notice to New South of potential age discrimination by Mr. Keller. (Doc. 26 at 9, citing *Sanders v. Shoe Show, Inc.*, 778 So. 2d 820, 823 (Ala. Civ. App. 2000) (critical element of plaintiff's claim was to show defendants actually knew or should have discovered that security guard was likely to commit the sort of act of which he was accused)).   It further asserts that this argument is due to fail because Pearce investigated McCoy's claim and found that Mr. Keller had not discriminated against him and that Mr. Keller was following all applicable procedures.[11] (Doc. 26 at 9 n.9).  The court finds that a single claim of race discrimination against Mr. Keller, which was investigated and found meritless, would not give New South notice of the alleged likelihood that Mr. Keller would commit age discrimination, particularly when the plaintiff herself had no inkling that she may have been the victim of age discrimination until she had been terminated and new employees hired.

Second, the plaintiff argues, Mr. Keller's 1999 performance review and an April 1999

---

[11]New South also points out that *Big B* is distinguishable from this case because the defendant in *Big B* failed to fully investigate a prior complaint of sexual harassment against its agent, whereas New South fully investigated McCoy's complaint about Mr. Keller. Although the record is not entirely clear about how thorough New South's investigation was (Pearce Depo. at 110-11), there  appears to be no allegation of gross deficiencies in the investigation as there was in *Big B*. *Big B*, 634 So. 2d at 1003 (investigating manager did not interview employee who claimed defendant's agent sexually harassed her).

e-mail message indicates that New South believed Mr. Keller needed to improve some of his

managerial skills, (doc. 23 at 22, citing doc. 24 at ex. 5 (Bates No. 90) and ex. 7), which in turn,

she asserts, meant that New South had notice of Mr. Keller's alleged likelihood of committing

age discrimination.  The court has examined these documents and has been unable to determine

how they would give notice to New South of Mr. Keller's alleged incompetence.  The

performance review, in pertinent part, states that

> Karl needs to focus his recruiting efforts on experienced, seasoned loan officers
> and processors who are self sufficient and need little supervision.  Due to Karl's
> attention to personal production, the staff needs to be upgraded through hiring
> and/or training.  Coaching, counseling and the documentation of performance of
> staff members need to improve.  Karl needs to be positive and upbeat in his
> comments and demeanor to his employees at all times but especially during times
> of confusion, chaos, or stress which occur naturally from time to time.  Karl's
> response to events and circumstances can have a positive or negative impact on
> the staff.  Current staff members not performing to standards are on remedial
> plans to upgrade performance.
>
> Branch operations need additional organization of work flow, hardware and
> software access, and supplies.  Loan officers and processors need to adhere to
> "Best Practices" and prescribed loan officer/processor procedures, duties, and
> responsibilities.  The focus should be on completing accurate loan applications
> requiring little follow up from processors and underwriters to reduce instances of
> last minute confusion on expedites.  The number and frequency of post closing
> issues needs to be reduced through more thorough application interviews and file
> documentation.  The goal should be to limit or reduce the number of items to be
> resolved at the closing table.

(Doc. 24 at Ex. 5, Bates No. 90).  The e-mail message to which the plaintiff refers states, in

pertinent part, as follows:

> I had a good meeting yesterday with Karl re: issues, problems, etc.  I discussed
> with Karl and Elizabeth revamping office duties and documenting clearly who
> does what, when and how, and to be mindful of managing a young staff where
> priorities constantly change from multiple sources (loan officers, customers, etc.),
> causing confusion.  The big problem I see is no consistency in direction set by
> Karl as he jumps from one thing to the next in a hurried, unorganized fashion.

With no set rules, etc. his people have difficulty performing with a high frustration level as a result.

Overall, the office seems to be settling down, and the presence of Kathy Shannon, the new processor and Janet Walker have assisted in this process.  They already closed $ 2.0mm through last week.  Should be a great month, and it seems to be under control to some degree better than a month ago.

* * *

Overall, the office will continue to need monitoring and training-retraining over time, but I think we all understand the issues, as does Karl.

We also counseled Jerry – he is hitting some targets (production) but missed others where we are giving him deadlines.

(Doc. 24 at Ex. 7).

While this evidence indicates that New South had notice of certain management problems experienced by Mr. Keller and of the fact that he needed to better organize the Tuscaloosa branch, none of this is probative as to the issue of whether New South knew or should have known of Mr. Keller's alleged incompetency – that he was likely to commit illegal age discrimination.

Third, the plaintiff argues that, although New South gave Mr. Keller manuals and policies, it never trained him with respect to those manuals or policies or with respect to New South's discrimination and harassment policies in particular.  (Doc. 23 at 22, citing K. Keller Depo. at 27-28).  Mr. Keller's testimony reflects, however, that he was certain that he had read the manuals and policies he received from New South, that he received training on personnel issues when he attended New South branch managers' meetings, that he received regular memos from personnel, that he had received extensive personnel training from a prior employer and that he was well aware of the law on employment discrimination.  (K. Keller Depo. at 28-31).  The

absence of formalized training with respect to particular manuals and policies of New South would not have provided New South with notice that Mr. Keller would be likely to commit illegal age discrimination.

The plaintiff points out that, in deciding that the claim for negligent training and supervision had been properly submitted to the jury, the *Big B* court found relevant the fact that the agent's supervisors had failed to review the company's training manuals with him in accordance with company policy or to otherwise train him as to the proper manner in which to question and detain a shoplifting subject. (Doc. 23 at 22-23; *Big B*, 634 So. 2d 1003). *Big B* is not sufficiently analogous to this case to support the plaintiff's position. Unlike the situation in *Big B*, the plaintiff has not shown that it was New South's policy for Mr. Keller's manager to sit down with him and review New South policies and manuals. Also, the agents in the two cases held different sorts of jobs entailing different duties and qualifications, and the sort of incompetence they displayed is vastly different -- in Mr. Keller's case, it is alleged age discrimination, the claim for which does not survive New South's motion for summary judgment, whereas in *Big B*, the alleged incompetence was an assistant store manager's false imprisonment and sexual battery of a retail customer, the occurrence of which was not in dispute.

The court finds that, taking the three items of evidence offered by the plaintiff in support of her negligent training and supervision claim either separately or together, the plaintiff has failed to demonstrate that there exists a genuine dispute of material fact with respect to whether New South had any notice of the alleged incompetence. Accordingly, the court finds that New South is due summary judgment on the plaintiff's negligent training and supervision claim.

## 2.    Fraud in the Inducement

The plaintiff alleges that before New South hired her, it misrepresented to her what would

be the terms and conditions of her employment at New South. (Doc. 1 at ¶ 62).  The particular

misrepresentation the plaintiff alleges is that New South told her that (1) she would  process

loans for Becky Hess, when she actually processed loans for Mr. Keller, (2) she would receive

some unspecified training, when she did not receive such training, and (3) she would work from

nine o'clock until three o'clock each day, when she was made to work outside those hours.  (Pl.

Depo. at 230-32).

The plaintiff cites *Kidder v. AmSouth Bank, N.A.*, 639 So. 2d 1361 (Ala. 1994), in support

of her claim.  The plaintiff in that case, despite her status as an "at will" employee, was found to

have an actionable fraud in the inducement claim based upon her allegations that the defendant

used misrepresentations to induce her to leave her former job and accept employment with the

defendant.  The *Kidder* court merely found, in response to a question certified by a federal court,

that this type of claim was actionable under Alabama law.  The court did not address the specific

facts or merits of the case.  *Kidder* was cited by the court in *Jabour v. Aetna U.S. Healthcare,*

*Inc.*, 2000 WL 303639 (M.D. Ala. February 15, 2000), which stated as follows:

> Alabama law [footnote omitted] recognizes a cause of action brought by an
> employee alleging fraud in the inducement of employment based upon
> misrepresentations about working conditions.  *See Kidder*, 639 So. 2d at 1363.
> Under Alabama law, in order to prove a fraudulent inducement claim a plaintiff
> must show that (1) the defendant had a duty to speak the truth; (2) the defendant
> made a false representation of a material fact; (3) the plaintiff reasonably relied on
> the false representation; [footnote omitted] and (4) the plaintiff suffered loss,
> harm, or damage as a proximate result of the false representation.  *See McGriff v.*
> *Minnesota Mut. Life Ins. Co.*, 127 F.3d 1410, 1414 (11th Cir. 1997); *Kidder*, 639
> So. 2d at 1362.  "However, the law places a heavier burden in those fraud actions
> where one attempts to prove fraud based on a misrepresentation relating to an

23

event to occur in the future." *National Sec. Ins. Co. v. Donaldson*, 664 So. 2d 871, 876 (Ala. 1995). A fraud claim in which the alleged fraud concerns a future promise, as opposed to a present fact, is known as promissory fraud. *See McGriff*, 127 F.3d at 1414. "In promissory fraud, the material existing fact that is misrepresented is the defendant's state of mind, when the defendant represents that he intends to perform some act although he does not in fact intend to perform it." *Spring Hill Lighting & Supply Co., Inc. v. Square D Co., Inc.*, 662 So. 2d 1141, 1149 (Ala. 1995); *see also Green v. Lumpkin (Ex Parte Lumpkin )*, 702 So. 2d 462, 466 (Ala. 1997). To prove promissory fraud the plaintiff must additionally show that, at the time of the alleged misrepresentation (the promise), the defendant did not intend to do the act or acts promised and intended to deceive the plaintiff. *See McGriff*, 127 F.3d at 1414; *Goodyear Tire & Rubber Co. v. Washington*, 719 So. 2d 774, 776 (Ala. 1998).

*Jabour*, 2000 WL 303639 at *7.

The plaintiff herein alleges as follows:

Plaintiff has established that she was solicited by Keller and Hess to accept employment at New South. She was lured with a better job, less hours and more pay. However, upon acceptance and giving up her prior job, [her] terms of employment changed drastically. She was caused to work different and longer hours, to accept job duties that had not been represented to her and more stringent goals not represented or equally applied to younger employees. Plaintiff was instructed not to tell Birmingham corporate office of her part-time status or her shorter working hours. This is further evidence of Keller's intent to deceive not only Plaintiff, but his own employer. Keller was the branch manager for New South.

Additionally, Plaintiff was not afforded the training she had been promised to make the adjustment from commercial loans for a bank to residential loans for a mortgage company. Indeed, Plaintiff was set up to fail and was terminated four months later.

Keller's misrepresentations to Plaintiff and the corporate office are all evidence consistent to prove his intent to deceive the plaintiff.

(Doc. 23 at 24).

The plaintiff asserts that, before she accepted a job with New South, she was told that she

would be processing residential mortgage loans for Becky Hess. (Doc. 23, citing Pl. Depo. at

24

34-35). She testified that Hess told her this, but that Keller did not make such a representation. (Pl. Depo. at 34-35, 51). Hess avers that she never had or claimed to have the authority to hire, discharge or affect the terms of the plaintiff's employment. (Hess Aff. at ¶ 6). The court finds that, even assuming that Hess had made such a representation, the plaintiff did not reasonably rely on it, as Hess was not in a position to make such a representation and did not claim authority to do so. It therefore cannot serve as a basis for the plaintiff's fraudulent inducement claim.

The plaintiff complains that she was told that she would be processing loans for Hess, but that she was required to process loans for others and that she was required to do receptionist work and to babysit the Kellers' children. (Doc. 23 at 3). As is set forth above, the plaintiff did not reasonably rely on Hess's alleged representation about her duties. And even if Mr. Keller had made such a representation, it does not preclude the possibility that the plaintiff would have other duties or would be asked to help out in the office in other ways. The alleged representation was that she would be processing loans for Hess, not that those would be her sole duties, excluding all others. The alleged addition of duties cannot serve as the basis for the plaintiff's fraudulent inducement claim.

The plaintiff argues that she was hired as a part-time employee with the hours of 9:00 a.m. to 3:00 p.m., but that her hours ultimately ranged anywhere from 6:00 a.m. to 3:00 p.m. (Doc. 23 at 3, citing Pl. Depo. at 230-31, 241). She stated that she came in at 6:00 a.m. six or seven times and that she came in several times on the weekends, and that she often worked later than 3:00 p.m. (Pl. Depo. at 67-68, 231). The plaintiff does not say that Mr. Keller ever prevented her from leaving when she desired except on two or three occasions, when she asked to leave and was told she could not because something pressing had to be done. (Pl. Depo. at

70).  When discussing staying after 3:00 p.m., the plaintiff stated that she said jokingly to Mr.

Keller, "It doesn't look like I'm going to get out of here on time again today, or – I hated to leave

with so much work to be done." (Pl. Depo. at 69-70).  This indicates that, except on two or three

occasions noted by the plaintiff, she voluntarily worked late to try to complete her assigned work.

This evidence does not demonstrate that New South intended to deceive her and make her work

longer hours than those that were agreed upon.[12]  The plaintiff's testimony that Mr. Keller did not

wish her to communicate her part-time status to the Birmingham office, without more, does not

show that Mr. Keller intended to deceive her about her work hours.  This allegation thus cannot

serve as the basis for the plaintiff's fraudulent inducement.

The plaintiff also asserts that she didn't get the training to do residential mortgage loan

processing that she had been promised before accepting the job with New South.  She alleges that

Mr. Keller, in response to her concerns about training, assured her "they would help [her] in any

way possible." (Pl. Depo. at 46-47).  This statement is too vague and generalized to sustain the

plaintiff's claim of fraud in the inducement.  *See, e.g., Hanson v. New Technology*, 594 So. 2d

96, 102 (Ala. 1992) (statement in employee handbook that disciplinary actions were administered

in an objective, constructive manner, was a vague, general statement rather than representation

sufficient to sustain fraud claim).

Even if Mr. Keller's vague representation about training were sufficiently specific to

sustain the plaintiff's claim of fraud in the inducement, her claim would still fail.  The evidence

shows that the plaintiff received more training than other loan processors under Mr. Keller's

---

[12]At best, this seems to indicate that Mr. Keller was overly optimistic about the plaintiff's
efficiency and speed in completing her work.

26

supervision, and more training than Mr. Keller intended to provide at the time he hired her.  (K. Keller Aff. at ¶¶ 7-8; Keane Aff. at ¶¶ 7-9).  The plaintiff has not shown that Mr. Keller made a false representation of a material fact about training or that he intended to deceive her by making any such representation when he hired her.

In arguing her claim of fraud in the inducement, the plaintiff also states that she was given "stringent goals not represented or equally applied to younger employees" (doc. 23 at 24), but she does not show that New South made any promises to her before she was hired about what her performance goals would be.  This claim therefore cannot survive New South's motion for summary judgment.

## V.   CONCLUSION

For the reasons set forth above, the court finds that New South's motion for summary judgment (doc. 18) is due to be granted.  The court will enter an Order concurrently herewith in accordance with this Memorandum Opinion.

**DONE** this _____ day of March, 2003.

**JOHN E. OTT**
United States Magistrate Judge